UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

Brian M. Burgess,

Plaintiff,

-v.-

1:03-CV-00652
(NPM-RFT)

County of Rensselaer; Rensselaer County
Sheriff's Department; Daniel Keating,
Larry Walraed, Robert Loveridge, Harold
Smith, Don Hogan, and Morteza S.
Naghibi, M.D., in their individual and
official capacities; Kathleen Jimino, in
her official capacity; John Does # 1
though 9; Adept Health Care Service,
Inc.; Sherry Lynn Mac Isaac, R.N.;
Pauline T. Rose, L.P.N.; Barbara Jean
Cicognami, R.N.; Rosemary Sorel,
L.P.N.; and Jane Does #1 through 2,

Defendants.

---

APPEARANCES:                           OF COUNSEL:

FOR THE PLAINTIFF:

Wilcox Law Firm                        Robert D. Wilcox
251 River Street
P.O. Box 1260
Troy, NY 12181-1260

FOR THE DEFENDANTS,
County of Rensselaer; Rensselaer County
Sheriff's Department; Daniel Keating,

Larry Walraed, Robert Loveridge, Harold
Smith, Don Hogan, and Morteza S.
Naghibi, M.D., in their individual and
official capacities; Kathleen Jimino, in
her official capacity; and John Does # 1
though 9:

Napierski, Vandenburgh& Napierski,          Thomas J. O'Connor
L.L.P.
296 Washington Avenue Extension
Albany, NY 12203


FOR THE DEFENDANTS,
Adept Health Care Service, Inc.:

Smith, Sovik, Kendrick and Sugnet,          James D. Lantier
P.C.                                        Gabrielle Hope
250 South Clinton Street
Suite 600
Syracuse, NY 13202-1252


FOR THE DEFENDANTS,
Sherry Lynn Mac Iasaac, R.N. and
Rosemary Sorel, L.P.N.:

Donohue, Sabo, Varley & Armstrong,          Bruce S. Huttner
P.C.
24Aviation Road
Albany, NY 12212-5056


FOR THE DEFENDANT,
Barbara Jean Cicognami, L.P.N.:

Wilson, Elser, Moskowitz, Edelman &         Joseph J. Perkins
Dicker, LLP                                 Elizabeth J. Grogan
677 Broadway - 9th Floor
Albany, NY 12207-2996


Neal P. McCurn, Senior District Judge

**Memorandum, Decision and Order**

In this civil rights action plaintiff Brian Burgess alleges that while he was held as a pre-trial detainee at the Rensselaer County Jail ("the Jail"), each of the 25 defendants named herein deprived him of his constitutional rights in one way or another.  Named as defendants are the County of Rensselaer ("County"); the Rensselaer County Sheriff's Department; Daniel Keating, the County Sheriff; Larry Walraed, the County Undersheriff; Robert Loveridge, a Sheriff's Department colonel; Harold Smith, a Sheriff Department lieutenant; Don Hogan, Sheriff Department Forensic Coordinator; Mortez S. Naghibi, M.D., Jail Physician; Kathleen Jimino, Rensselaer County Executive; John Does No. 1-9; Adept Health Care Service, Inc. ("Adept"); Sherry Lynn Mac Isaac, R.N., Pauline T. Rose, L.P.N., Barbara Jean Cicognani, L.P.N. and Rosemary Sorel, L.P.N., nurses who purportedly worked at the Jail as employees of Adept.; and Jane Does No. 1&2.

The crux of plaintiff's argument is that if, among other things, the defendants had "regular[ly] and continuous[ly] observe[ed] [his] activities and/or [his] medical condition[,]" he would not have fractured his left hip while incarcerated.  Doc. #55,  exh. A thereto (Co.) at 13, ¶ 54.  The first four of plaintiff's ten causes of action are based upon 42 U.S.C. § 1983.  Additionally, he alleges six supplemental state law claims: (1) medical malpractice; (2) breach of contract[1]; (3) intentional and/or negligent infliction of emotional distress; (4)

---

[1] At oral argument, plaintiff's counsel admitted that the second supplemental claim is actually intended to be a claim for negligence, not breach of contract.  See Doc. 87, Tr. at 59:20-60:8.

1

negligence; (5) gross negligence; and (6) negligent supervision and retention of employees.

On January 25, 2006, the court heard oral argument with respect to the defense motions for summary judgment brought pursuant to Fed. R. Civ. P. 56. The court reserved decision.  Following constitutes the court's decision in this matter.

## I. *Parties' Submissions*

Prior to oral argument, the court alerted counsel to what it deemed to be certain deficiencies in their motion papers – deficiencies which made resolving the court's task on these motions unnecessarily arduous.  At that time the court took a fairly hardline approach in terms of what it would and would not deem to be part of the record.  Upon further reflection, however, because it does not believe that parties should bear the brunt of their counsels' transgressions, and "because it does not wish to apply the Rules with a rigidity that would undermine the interests of justice," Hudson v. Internal Revenue Service, No. 03-CV-172, 2004 WL 1006266, at *4 n.9 (N.D.N.Y. March 25, 2004) (internal quotation marks and citation omitted), the court has retreated somewhat from its stated position prior to oral argument.  Although "adverse to the conservation of judicial resources[,]"[2] Kilmer v. Flocar, Inc., 212 F.R.D. 66, 69 ((N.D.N.Y. 2002) (citations omitted), and although the court was "not required to consider what the parties fail[ed] to point out in their Local Rule [7.1 . . .] statements[,]" this court "in its discretion . . . has

---

[2]     Obviously scarce judicial resources "are most efficiently used when the parties meet their adversarial duties in a tightly orchestrated and lucid manner[,]" Kilmer 212 F.R.D. at 69 (citations omitted), which most decidedly was *not* the case here.

opt[ed] to conduct an assiduous review of the record[.]"[3] See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks and citations omitted); see also Badlam v. Reynolds Metals Company, 46 F.Supp.2d 187, 193 n.2 (N.D.N.Y. 1999) (court "parsed the record" where "the brunt of counsel's neglect w[ould] [have been] . . . .  borne by their clients").  Thus, although it could have, the court "did *not* turn a blind eye to the facts elsewhere available[.]" See Little v. Cox Supermarkets, 71 F.3d 637, 641 (7th Cir. 1995) (emphasis added). Counsel are forewarned that the court  will not be so lenient in any future submissions which are similarly lacking.

## II.  Defendants

Based upon several concessions by plaintiff, the court grants the motions for summary judgment as to Jane Does 1 & 2; John Does 1-9; the Rensselaer County Sheriff's Department ("the Sheriff's Department" or "the Department"); and Kathleen Jimino, sued solely in her official capacity as Rensselaer County Executive.  Granting these motions reduces the  number of defendants from 25 to eleven.  Further, despite the plain language of the complaint wherein plaintiff alleges that he is suing a number of the municipal defendants both in their individual and in their official capacities, during oral argument he changed his position.  Now, plaintiff maintains that he is suing the following municipal defendants *solely* in their *individual capacities*: Daniel Keating, the County Sheriff; Larry Walraed, the County Undersheriff; Robert Loveridge, a Sheriff's Department colonel; Harold Smith, a Sheriff Department lieutenant; Don Hogan,

---

[3]      To be sure, "there is a point when forbearance of a party's noncompliance with the Rules unfairly prejudices [its] adversaries."  Hudson, 2004 WL 1006266, at *4 n.9 (internal quotation marks and citations omitted).  That point has not been reached here, however, especially given the fact that no party is wholly without fault in this regard.

Sheriff Department Forensic Coordinator; and Mortez S. Naghibi, M.D., Jail Physician.  The court will proceed with its analysis accordingly.

### III.  42 U.S.C. § 1983

Plaintiff's first four causes of action are based upon 42 U.S.C. § 1983,[4] which allows citizens to sue a state official for the deprivation of "any rights, privileges, or immunities secured by the Constitution and laws [of the United States]."  42 U.S.C. § 1983. To establish a claim under 42 U.S.C. § 1983, a plaintiff "must show that: 1) a person acting under color of state law committed the conduct complained of and 2) that the conduct deprived the Plaintiff[] of some constitutional right."  Shpigler v. Etelson, No. 05 Civ. 6206(CLB), 2005 WL 2874792, at *6 (S.D.N.Y. Nov. 1, 2005) (citing Daniels v. Williams, 474 U.S. 327 (1986)).

The nurses contend that they are entitled to summary judgment with respect to plaintiff's first and third causes of action because plaintiff Burgess cannot establish either that they were state actors or that they deprived him of a constitutional right.  For obvious reasons, the municipal defendants are not challenging their status as state actors. Like the nurses, however, the municipal defendants contend that they are entitled to summary judgment with respect to the first and third causes of action because plaintiff cannot establish that any of them deprived him of a constitutional right.  The court will address each of these arguments in turn.

---

[4]      Hereinafter references to plaintiff's first, second, third and fourth causes of action shall be read as referring to those brought pursuant to section 1983, as opposed to his [pendent] state law claims.

### A. State Actor

The facts underlying the state actor issue are not in dispute, only the application of the law to said facts.  The court will proceed with its analysis accordingly.

"The fundamental purpose of § 1983 is to provide compensatory relief to those deprived of their federal rights by state actors."  Brown v. Community Action Organization, Inc., No. 03-CV-295S, 2005 WL 2412817, at *2 (W.D.N.Y. Sept. 29, 2005) (internal quotation marks and citations omitted).  Thus, "a court assessing the viability of a § 1983 claim must first determine whether the actions alleged were committed under color of state law."[5]  Id. (citation omitted).   The nurses contend that they are not state actors because they did not have a contract with the state to provide medical services to those retained at the Jail.  Rather, defendant nurses explain that they worked for defendant Adept, a company which "provides a variety of nursing services in a number of different settings."  Doc. 55 at 9.  Given the absence of a contract directly between the nurses and the County, the nurses claim that their relationship with plaintiff was nothing more than that of any "nurse and . . . patient[.]"  Id.   Hence the nurses reason that they cannot be held liable under section 1983 as they were not state actors when providing medical care to plaintiff.

Plaintiff counters that the nurses are state actors because they were employed by Adept, which *did* have a contract with the County to provide nursing care to Jail detainees.  Thus, plaintiff alleges that he was deprived of his

---

[5]       This "under color of state law" requirement "has consistently been treated as the same thing as the state action required under the Fourteenth Amendment."  Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982) (internal quotation marks and citations omitted).

constitutional rights by "persons for whom the county is responsible and who were responsible to the county." Doc. 74 at 2 (citations omitted).

To support their argument that they are not state actors, the nurse defendants rely heavily upon Nunez v. Horn, 72 F.Supp.2d 24 (N.D.N.Y. 1999). In Nunez, the court held that the defendant physician who (1) operated on the plaintiff inmate at a hospital outside the prison; (2) did not have a contract with the state to render such services; and (3) was not a prison employee was not a state actor. To be sure, like the doctor in Nunez, the defendant nurses were not jail employees; nor did they, as individuals, have a contract with the County to provide nursing services. The lack of a contractual relationship between the nurses and the County is not dispositive of the state actor issue herein. That is especially so given the fact that the defendants nurses were employed by Adept, an entity which albeit private did have a contract with the County to provide nursing services to ail detainees; and is itself a state actor. Under the terms of that contract, the County reimbursed Adept, which in turn paid the nurses for providing their services to Jail detainees. Thus, in contrast to Nunez, there *was* a contractual relationship between the defendant nurses and the County, albeit not a direct one.

Nunez is also distinguishable from the present case because the defendant nurses did *not* "freely perform [their] medical duties in a much more physician-controlled environment[,]" *i.e.* a private non-prison hospital. Nunez, 72 F.Supp.2d at 27. Rather, the nurses here were rendering their medical services within the confines of a county jail where "the nonmedical functions of prison life inevitably influence the nature, timing, and form of medical care provided to inmates such as [the plaintiff]." See West v. Atkins, 487 U.S. 42, 57 n. 15 (1988). Given these factual differences between Nunez and this action, the defendant nurses' reliance

upon <u>Nunez</u> is misplaced.  What is more, even a cursory examination of the relevant state actor jurisprudence demonstrates that the nurses are state actors.

"When, as here, the defendant is a private . . . individual, in order to satisfy the state action requirement, the allegedly unconstitutional conduct must be fairly attributable to the State." <u>Szekeres v. Schaeffer</u>, 304 F.Supp.2d 296, 306 (D.Conn. 2004) (internal quotation marks and citation omitted).  "Numerous  Supreme Court cases have identified the 'host of facts that can bear on the fairness of such an attribution.'" <u>Community Action Organization</u>, 2005 WL 2412817, at *3 (quoting <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 296 (2001)).  Succinctly put, "a private activity is deemed state action: (1) when there is a close nexus between the private and state actors, (2) when the private activity is a product of state compulsion, *or* (3) when the private activity is a public function." <u>Turturro v. Continental Airlines</u>, 334 F.Supp.2d 383, 394 (S.D.N.Y. 2004) (footnote omitted) (emphasis added).

Application of the public function test to the record as presently constituted provides further support for the conclusion that the defendant nurses are state actors.  To be considered state actors under that test, the plaintiff must show that the private party used powers "traditionally the exclusive prerogative of the State." <u>Rendell-Baker</u>, 457 U.S. at 842.  "The standard to declare a function to belong exclusively to the state is strict, and an extraordinarily low number of functions have been held to be public." <u>Turturro</u>, 334 F.Supp.2d at 396.  Nonetheless, it is well-settled that "the provision of medical care to . . . prisoners is a public function, even if private physicians contract with the government to provide those services." <u>Young v. Halle Housing Associates, L.P.</u>, 152 F.Supp.2d 355, 365 (S.D.N.Y. 2001) (citing <u>West v. Atkins</u>, 487 U.S. 42, 54 (1988)).  In part the

underlying rationale for that conclusion is that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." See Estelle v. Gamble, 429 U.S. 97, 103 (1976).   As the Supreme Court explained more fully in West:

> It is only those physicians authorized by the
> State to whom the inmate may turn.  Under state
> law, the only medical care . . . West could receive
> . . . was that provided by the State.  If the
> Doctor . . . misused his power by demonstrating deliberate
> indifference to the plaintiff's serious medical needs,
> the resultant deprivation was caused, in the sense relevant
> for state-action inquiry, by the State's exercise of its right to
> punish the plaintiff by incarceration and to deny him
> a venue independent of the State to obtain needed medical care.

West, 487 U.S. at 56.

Even though the issue in West was whether a private doctor who was under contract with the state to provide medical care to inmates at a state prison hospital was a state actor for section 1983 purposes, nothing in West or its progeny suggests that a distinction should be made between doctors and nurses in that setting.  Because Nunez is readily distinguishable from the present case and because the defendant nurses herein were engaging in a public function, the court denies their summary judgment motion to the extent they are claiming that they are not state actors.  This conclusion is bolstered by the fact that given its contractual relationship with the County to provide nursing services to County jail inmates, as the nurse defendants acknowledge in their reply memorandum,"Adept may very well be a state actor for the purpose of § 1983[.]" Doc. 75 at 5.  See Sherlock v. Montefiore Medical Center, 84 F.3d 522, 527 (2d Cir. 1996) (citation omitted) ("The fact that a municipality is responsible for providing medical attention to

8

persons held in its custody may make an independent contractor rendering such services a state actor within the meaning of § 1983 with respect to the services so provided[.]")  "[B]y extension," then, the nurses, as employees of a state actor are also state actors.  <u>See</u> <u>Riester v. Riverside Community School</u>, 257 F.Supp.2d 968, 972 (S.D.Ohio 2002) (where community school was found to be a state actor, so were its employees and management companies); <u>cf.</u> <u>Davis v. Cole-Hoover</u>, No. 03CV550, 2004 WL 1574649, at *10 (W.D.N.Y. June 14, 2004) ("The question of whether [the hospital] (and its affiliated medical personnel) is a state actor . . . turns on the contractual relationship [the hospital] had with DOCS [the Department of Correctional Services].")

### B.  *Deprivation of a Constitutional Right*

Section 1983 "is not in itself a source of substantive rights, but instead proves a method for vindicating federal rights elsewhere conferred."  <u>Kearsey v. Williams</u>, No. 99 Civ. 8646 DAB, 2005 WL 2125874, at *2 (S.D.N.Y. Sept. 1, 2005) (internal quotation marks and citations omitted).  In the present case, plaintiff relies upon five separate constitutional amendments as the bases for his section 1983 claims.  In his first cause of action, plaintiff alleges that *all* of the individual defendants denied him medical treatment, and this denial amounted to deliberate indifference to his serious medical needs in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.  The second cause of action is against certain Jail officials for failure to intercede on plaintiff's behalf when his rights were being violated.  Plaintiff's third cause of action is substantially similar to his first, except that it is couched solely in terms of the Due Process Clause of the Fourteenth Amendment, and it names therein only two municipal defendants --  Forensic Coordinator Hogan and Dr. Naghibi -- along

with the nurses.  Plaintiff's fourth cause of action alleges that the municipal defendants, with the exception of the doctor, through their "policies, procedures, customs and practices. . . violated [his] civil rights . . . under the First, Fourth, Fifth, Eighth and Fourteenth Amendments[.]" Co. at 18, ¶ 70.

Of the five amendments to which plaintiff Burgess cites in his complaint, only one directly applies here -- the Fourteenth.  On the face of it, the freedoms which the First Amendment protects, such as "speech, press, religion, assembly, association and petition for redress of grievances[,]" <u>Malloy v. Hogan</u>, 378 U.S. 1, 5 n. 4 (1964) (and cases cited therein), are not implicated herein; and plaintiff has not attempted to explain how they might be.  Accordingly, to the extent plaintiff's fourth cause of action is predicated upon alleged violations of the First Amendment, the court *sua sponte* grants summary judgment in defendants' favor. Likewise, there is no readily apparent basis for plaintiff's reliance upon the Fourth Amendment which protects against "unreasonable searches and seizures," U.S. Const. amend. IV, and plaintiff offers none.   Thus the court *sua sponte* grants summary judgment in defendants' favor in this regard as well.

Plaintiff fares no better when it comes to the Fifth Amendment, which applies only to the federal government.  <u>Sylla v. City of New York</u>, No. 04-cv-5692, 2005 WL 3336460, at * 2 (E.D.N.Y. Dec. 8, 2005) (citing <u>Public Utilities Commission of District of Columbia v. Pollak</u>, 343 U.S. 451, 461 (1952)). "Where, as here, defendants are municipal, rather than  federal entities and officials, a due process claim under the Fifth Amendment must be dismissed." <u>Id.</u> (citation omitted).  Thus  plaintiff has improperly invoked the Fifth Amendment, and the court *sua sponte* grants summary judgment in defendants' favor in this regard as well.  Likewise, because plaintiff Burgess was an *un*convicted pre-trial

detainee at the times of the events complained of herein, and not an inmate, his reliance upon the Eighth Amendment is misplaced.  See R.Dye v. Virts, No. 03-CV-6273L, 2004 WL 2202638, at *3 n.1 (W.D.N.Y. Sept. 28, 2004) ("At all relevant times, plaintiff was a *pretrial detainee*, not a prisoner, and as such, the Eighth Amendment does not apply.")[6]   In light of the foregoing, the only source of the constitutional right which plaintiff is seeking to vindicate is his Fourteenth Amendment due process right to adequate medical treatment.

### *1.  Due Process*

Because the nurse defendants' state actor argument is unavailing, and because there is no dispute that the municipal defendants are state actors, the issue becomes whether any of these defendants deprived plaintiff of his right to adequate medical care.  At this juncture the court also will address this issue in terms of the individual municipal defendants.

"[T]he official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition *and* did so because of his deliberate indifference to that need."  Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996) (citation omitted) (emphasis added).  These requirements serve different purposes.

---

[6]   Some courts have stated that "[w]hether the Eighth Amendment or the Fourteenth Amendment applies is largely academic given that the same deliberate indifference to a serious medical need test is applied to both inmates and pretrial detainees alleging denial of adequate medical care."  Scott v. Delsignore, No. 02-CV-029F, 2005 WL 425473, at *7 n.5 (W.D.N.Y. Feb. 18, 2005) (citations omitted); see also Davis v. Reilly, 324 F.Supp.2d 361, 367 (E.D.N.Y. 2004) (regardless of the "academic distinction," standard for analyzing pretrial detainee's due process claim is same as the standard under the Eighth Amendment).  The distinction between a deliberate indifference analysis under those two amendments is not wholly academic given that, as will be more fully discussed herein, courts have applied different knowledge requirements depending upon whether or not the plaintiff is a pre-trial detainee.

11

"The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." Smith v. Carpenter, 316 F.3d 178, 183-84 (2d Cir. 2003) (citations omitted).

### a. "Serious Medical Condition" and/or "Need"

For purposes of these motions only, during oral argument the defendants willingly conceded that plaintiff's alcohol withdrawal syndrome ("AWS") constitutes a serious medical need or condition. See Tr. at 15. Given this concession,[7] the court will move on to address the deliberate indifference element.

### b. "Deliberate Indifference"

What was implicit in the parties' written submissions became explicit during oral argument: They disagree as to the legal standard to be applied in deciding whether a given defendant was deliberately indifferent. Defendants urge the court to employ a subjective standard, whereas plaintiff urges the use of an objective standard. To support the use of a subjective standard, defendants rely upon Farmer v. Brennan, 511 U.S. 825 (1994), wherein the Supreme Court held that an official acts with deliberate indifference when he "*knows of* and disregards an excessive risk to inmate health or safety[.]" Id. at 837 (emphasis added). The Farmer Court further held that such actual knowledge may be inferred from "evidence that the risk was obvious or otherwise must have been known to a defendant[.]" Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003) (citing Farmer,

---

[7]     Defendants are unwilling to concede that plaintiffs' fractured hip rose to the level of a serious medical condition. Tr. at 27. Given their concession that AWS constitutes such a condition, however, combined with the close relationship between the AWS and the fractured hip, it is possible to resolve the present motions without separately deciding whether plaintiff's fractured pelvis in and of itself was a serious medical condition.

12

511 U.S. at 842).  In contrast, relying upon Second Circuit case law, plaintiff Burgess maintains that this court should employ "an objective standard, requiring determination of what the official knew or should have known," Weyant, 101 F.3d at 856 (citing Liscio v. Warren, 901 F.2d 274, 276-77 (2d Cir. 1990)).

Plaintiff Burgess has the better argument.  In assuming the applicability of the Farmer actual knowledge standard, the defendants fail to take into account plaintiff's status.  In contrast to Farmer, who was an inmate,  plaintiff Burgess was an *un*convicted pre-trial detainee at the time of the acts complained of herein.  Burgess' status is significant because as previously stated, as a pre-trial detainee his claims of inadequate medical care are analyzed under the Due Process Clause of the Fourteenth Amendment,  See Richardson v. Nassau County, 277 F.Supp.2d 196, 201 (E.D.N.Y. 2003), rather than under the Eighth Amendment, which was the constitutional basis for the plaintiff inmate's claims in Farmer.  The Second Circuit's rationale for applying what has been described as a "more protective standard[,]" Gulett v. Haines, 229 F.Supp.2d 806, 815 (S.D. Ohio 2002) (footnote omitted), is grounded in its conviction "that an unconvicted detainee's rights are *at least as great as* those of a convicted prisoner." Weyant, 101 F.3d at 856 (citing, *inter alia*, City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244 (1983)) (emphasis added).

To be sure, "the Supreme Court has not stated whether the [Farmer actual knowledge] standard should be applied in the due process context[.]"  Weyant, 101 F.3d at 856.  However, given the Second Circuit authority directly on point, this court will analyze plaintiff's deliberate indifference claims in terms of whether each of the individual defendants knew or should have known of plaintiff Burgess' serious medical condition, as have other courts within this Circuit.  See, e.g.,

Pettus v. Horn, No. 04 Civ. 459, 2005 WL 2296561, at *3 (S.D.N.Y. Sept. 21, 2005) (citation omitted) (granting summary judgment to nurse and doctor on deliberate indifference claim where there was no evidence to support plaintiff's assertion that those defendants "should have known that he suffered from something other than an ear infection"); Frazier v. Captain, No. 96 CIV. 2639, 1999 WL 1084241, at *2 (S.D.N.Y. Dec. 1, 1999) (denying summary judgment on deliberate indifference claim where corrections officer "who was able to see [plaintiff] through the cell window, might well have known, or be charged with knowledge, that [plaintiff] was having an asthma attack[]").

Once it is determined that a plaintiff's medical condition was objectively serious, the issue becomes "whether there is enough record evidence to support an inference that any defendant acted with a sufficiently culpable state of mind in the treatment of [or failure to treat] those serious medical needs." Id. at 144 (internal quotation marks and citation omitted). Such a state of mind "describes a mental state more blameworthy than negligence[.]" Id. (citations omitted). It "is a mental state equivalent to criminal recklessness, i.e. a conscious disregard of a substantial risk of serious harm." Young-Flynn v. Horn, No. 03-CV-3434JG, 2005 WL 3544087, at *3 (E.D.N.Y. Dec. 28, 2005) (citation omitted). "Thus, a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." Kemp v. Wright, No. 01 CV 562, 2005 WL 893571, at *4 (E.D.N.Y. April 19, 2005) (internal quotation marks and citation omitted). By the same token though, "a plaintiff is not required to show that the defendant acted for the very purpose of causing harm or with knowledge that harm will result." Young-Flynn, 2005 WL 3544087, at *3 (internal quotation marks and citations omitted).

14

As the foregoing demonstrates, "mere negligence will not support a section 1983 claim; the conduct complained of must shock the conscience or constitute a barbarous act." Hannah v. Chouhan, No. 3:04-CV-314, 2005 WL 2042074, at *3 (D. Conn. Aug. 24, 2005) (internal quotation marks and citations omitted). Similarly, "mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm." Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000) (internal quotation marks and citations omitted).

Nor does "mere disagreement over the proper treatment" create a constitutional deliberate indifference claim. Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998). "So long as the treatment is adequate, the fact that a prisoner might prefer a different treatment does not give rise to a[] [constitutional] violation." Id. Likewise, "a claim of misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is not cognizable under section 1983." Hannah, 2005 WL 2042074, at *3. Nor are "[d]isagreements over medications, diagnostic techniques . . . forms of treatment, or the need for specialists or the timing of their intervention . . . adequate grounds for a [s]ection 1983 claim." Rush v. Artuz, No. 00 Civ. 3436, 2004 WL 1770064, at *9 (S.D.N.Y. Aug. 6, 2004) (internal quotation marks and citation omitted).

"To succeed in showing deliberate indifference, [plaintiff] must show that the acts of defendants involved  more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger." Denis v. N.Y.S. Department of Correctional Services, No. 05Civ.4495, 2006 WL 217926, at *13 n. 16 (S.D.N.Y. Jan. 30, 2006) (internal quotation marks and citation omitted); see

15

also Turner v. Goord, 376 F.Supp.2d 321, 326 (W.D.N.Y. 2005) (citations omitted) ("To establish deliberate indifference, . . . , plaintiff must prove that the defendant had a culpable state of mind and intended wantonly to inflict pain.)

Because the thrust of plaintiff Burgess' deliberate indifference claim is a claimed delay in providing medical care, it should be noted that "*intentional* denial or *delay* in accessing medical care may evidence deliberate indifference." Richardson v. Nassau County, 277 F.Supp.2d 196, 203 (E.D.N.Y. 2003) (emphasis added). In fact, in certain circumstances, a five or six hour delay may rise to the level of deliberate indifference. See Davidson v. Harris, 960 F.Supp. 644, 648 (W.D.N.Y. 1997), citing Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984). However, "the reason for the delay is more significant than its duration." Grant v. New York City Dep't of Corrections, No. 94-Civ.-2793, 1996 WL 14463, at *4 (S.D.N.Y. Jan. 16, 1996), citing Archer, 733 F.3d at 16. Courts have reserved a finding of deliberate indifference based on a delay in accessing medical care "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life threatening and fast degenerating' condition for three days; or delayed major surgery for over two years." Freeman v. Strack, No. 99-Civ.-9878, 2000 WL 1459782, at *6 (S.D.N.Y. Sept. 29, 2000), quoting Demata v. New York State Correctional Dep't of Health Servs., No. 00-0066, 198 F.3d 233 (Table), 1999 WL 753142 at *2 (2d Cir. Sept. 17, 1999) (citations omitted). Nonetheless, it is important to remember that "an inadvertent failure to provide adequate medical care is not  tantamount to deliberate indifference." Richardson, 277 F.Supp.2d at 203 (internal quotation marks and citation omitted).

There is no need to repeat the entire body of summary judgment law which

16

has developed since what has been dubbed the <u>Celotex</u> trilogy,[8] but some aspects do bear repeating.  It is beyond dispute that "[t]he burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment." <u>Denis v. N.Y.S. Department of Correctional Services</u>, No. 05 Civ.4495, 2006 WL 217926, at *9 (S.D.N.Y. Jan. 30, 2006) (citing, *inter alia*, <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970)).  "The movant may discharge this burden by demonstrating . . . that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof." <u>Id.</u> (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  The court must keep firmly in mind, and not lose sight of the fact that in opposing these defense motions, "it is . . . plaintiff[] [Burgess'] burden to produce the evidence that can establish . . . deliberate indifference." <u>See</u> <u>Jane Doe II v. City of Hartford</u>, No. Civ.3:01CV1026(AHN), 2005 WL 2009051, at *3 (D.Conn. Aug. 22, 2005) (citing <u>Celotex</u>, 477 U.S. at 322-23)).  Thus, defendants will be entitled to summary judgment as to the due process claims, if they can show an absence of evidence to support plaintiff's claims of deliberate indifference.

### *i.  Defendant Sorel*

In arguing that she was not deliberately indifferent as a matter of law, defendant Sorel describes only her interaction with plaintiff on May 27, 2002.  For the moment that will be the focus of the court's inquiry as well.

On May 27, 2002, plaintiff's fourth day of incarceration, at approximately 7:50 p.m., defendant Sorel gave plaintiff Effexor, an anti-depressant.  See Doc. 55,

---

[8]     In 1986 the Supreme Court decided three cases which clarified the standards to be employed in deciding Rule 56 motions for summary judgment.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986); and <u>Matsushita Elec. Industr. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).

attachment 38 thereto ("Sorel Stmt") at ¶ 17 (citation omitted); and Doc. 74, attachment 6 thereto ("Pl. Resp. to Sorel") at ¶ 17.  Around that same time, Ms. Sorel "checked" on plaintiff and observed that "he was acting very strange, very bizarre[,]" so she called another defendant, Morteza S. Naghibi, the Jail physician. See id. at ¶ 18  (citing, inter alia, exh. E thereto at 82-83); Pl. Resp. to Sorel at 2, ¶ 18.  At her deposition Ms. Sorel testified that during that telephone conversation she "advise[d]" the Dr. that plaintiff "was having DT's [sic] [delirium tremors][;]" he was "trembling[;]" and he was having "hallucinations[.]" Id. at ¶ 19 (citing exh. E at 62); Pl. Resp. to Sorel at 2, ¶ 19;  Ms. Sorel further testified that at that point she "kn[e]w plaintiff was pretty incoherent." Id. at ¶ 18 (citing, exh. E at 82); Pl. Resp. to Sorel at 2, ¶ 18.

In response to defendant Sorel's inquiry, Dr. Naghibi ordered Librium, id. at ¶ 19 (citing exh. E at 62); Pl. Resp. to Sorel at 2, ¶ 19, which Sorel gave to him at 9:20 p.m. Id. at ¶ 20 (citing exh. G at 50);[9] and Pl. Resp. to Sorel at 3, ¶ 20 (citing, inter alia, exh. G at 50).  Thus, within an hour and a half of defendant Sorel first noticing that plaintiff was having what she "believe[d] to be" AWS, the proof is uncontroverted: She contacted Dr. Naghibi; he ordered Librium and she administered it.  See id. at ¶ 18 (citing exh. E at 47); Pl. Resp. to Sorel at 2, ¶ 18. Additionally, defendant Sorel "directed the . . . Corrections Officers to put . . . plaintiff on . . . Frequent Supervised Visit [FSV] status," so that a Corrections Officer would be "keeping a watchful eye" on plaintiff, "checking on him at least

---

[9]     Plaintiff denies paragraph 20 of defendant Sorel's L.R. 7.1(a) Statement wherein she states, among other things, that plaintiff received his first dose of Librium at 9:20 p.m.  See Pl. Resp. to Sorel at 3, ¶ 20.  Both plaintiff and defendant Sorel cite to page 50 of the M-1 Unit Log which substantiates this fact however.  Thus, there is no basis for plaintiff's denial of this uncontroverted proof.

every 15 minutes, and reporting any difficulties to the Nursing staff." Id. at ¶ 21 (citations omitted); and Pl. Resp. to Sorel at 3, ¶ 21.  Prescribing Librium and placing and inmate on FSV status were "standard" orders for AWS at the Jail.  See id. (citing exh. E at 64); see also Pl. Resp. to Sorel at 3, ¶ 21.  Based upon the foregoing facts, *all* of which plaintiff freely admits, defendant Sorel maintains that there is an absence of evidence to support a claim of deliberate indifference against her.  Hence, she argues, she is entitled to summary judgment [as to the first and third [section 1983 based] causes of action.]

Although defendant Sorel was the first nurse at the jail to recognize the possibility that plaintiff had AWS, and although she acted promptly once she came to that conclusion,  plaintiff counters that nonetheless Sorel was deliberately indifferent.  He posits that defendant Sorel was deliberately indifferent on May 27, 2002, because she "either was or could and should have been in possession of sufficient information to make or call for a significantly more aggressive response to [his] serious medical condition" than the response outlined above.  Doc. 71 at 16, ¶ 58.  In plaintiff's opinion, this "significantly more aggressive response[]" meant that he should have been hospitalized "to confirm [Sorel's] . . . diagnosis of [AWS][.]" Id.  Hospitalization was also mandated, in plaintiff's view, so that he could obtain "appropriate and necessary treatment and observation" and to "determine the source [of] and [to] treat his pain[]" on that date.  Id.  From plaintiff's perspective Sorel was also deliberately indifferent "on and after" May 27, 2006, by "fail[ing] . . . to seek  the transfer of Plaintiff to a hospital for appropriate treatment and to ensure [his] timely examination  by [Dr.] Naghibi[.]" See id. at 16, ¶ 59.  Plaintiff further raises the specter that Sorel was deliberately indifferent because on May 27, 2002, she did not "check" on plaintiff until

19

approximately seven hours after her shift began.  Doc. 74 at 3.  During oral argument plaintiff added yet another theory of deliberate indifference  – the fact that supposedly another inmate told Sorel that plaintiff was in pain, but she never responded.

On the face of it, these arguments are straightforward.  The task of analyzing them was made unnecessarily arduous by two factors: (1) the manner in which plaintiff sought to meet his burden of production; and (2) the manner in which he presented his legal arguments.

As a vehicle for demonstrating a genuine issue of material fact, plaintiff's Response to Sorel's L.R. 7.1(a) Statement was practically useless.  When cites were provided, more often than not they did not support a given proposition.  For example, plaintiff asserts that on five different days defendants "Sorel and/or Mac Isaac were aware, or could and should have become aware[]" of certain conditions which plaintiff purportedly had.  Pl. Resp. to Sorel at 3-4, ¶36.  Plaintiff did not cite to the record to support any of these statements, however; and, as the Second Circuit has recognized, "a court is not required to consider what the parties fail to point out[.]" Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks and citations omitted).   Moreover, conclusory and speculative, unsupported statements such as that/this fall far short of the "affirmative and specific evidence showing that there is a genuine issue for trial[,]" which the Supreme Court has held the non-moving party must show to survive summary judgment.  See Toriola v. New York City Transit Authority, No. 02 CIV. 5902, 2005 WL 550973, at *4 (S.D.N.Y. March 9, 2005) (citing Liberty Lobby, 477 U.S. at 256-57).

Omitting record cites was not the only way in which plaintiff's opposition

20

papers were lacking.  Through his attorney's affidavit, the plaintiff did provide a far more detailed recitation of the facts than is found in either his memorandum or his L.R. 7.1 Response, but that did not completely cure the defects just described. For one thing, as with his L.R. 7.1 Response, many times the cites in attorney Wilcox's affidavit did not support a given averment.  To illustrate, plaintiff avers that defendant Sorel administered Effexor and Librium to him on May 28, 2002, at 2:00 p.m. and 7:47 p.m.  See Doc. 71 at 6, ¶ 16.  The cited "Medication Administration Records" does not support this "fact;" nor do any of the other cited documents.  At best, all that can be shown from the cited documents is that on May 28, 2002 at "19:47 [7:47 p.m.]" there were "meds [medications] on [the] unit, [and] no refusals."  Doc. 55, exh. G thereto at 1st unnumbered page after p. 57.

Plaintiff has not cited to any part of the voluminous record showing that it was defendant Sorel who was responsible for giving those medications to plaintiff and/or that she did so at those times on that date.  This is but one example of many where a careful review of the cited documents reveals that they did not support plaintiff's version of the facts as averred in his attorney's affidavit.  Obviously, failing to accurately cite to the record significantly undermines a party's credibility.  Compounding plaintiff's failure to properly and adequately identify those facts which he believes defeat Sorel's summary judgment motion is the lack of legal analysis in his opposing memorandum.  It might have been possible to overlook the slipshod manner in which plaintiff submitted claimed factual disputes had his memorandum of law included legal arguments, which the Second Circuit has defined "as advancing one's contentions by *connecting the law* to the facts[,]" Sioson, 303 F.34d 458, 460 (2d Cir. 2002) (emphasis added), but it did not.  There is not one cite to the record in plaintiff's memorandum submitted in opposition to

21

defendant Sorel's and Mac Isaac's summary judgment motion.  Instead, plaintiff offers such pejorative and speculative statements as the following:  "A mere cursory review of the Corrections Officer's entries in the jail logs pertaining to their observations of the Plaintiff and his dire condition would have snapped any conscientious medical person to attention and an immediate response."  Doc. 74 at 3.  Plainly such statements do not advance plaintiff's arguments in any way.  In fact, they have the opposite effect.

Moreover, when plaintiff did include cites to case law, he did not include the "requisite combination of authorities and putative facts."  See id. (footnote omitted).  Thus, in the words of the Sioson court, plaintiff Burgess' memorandum is nothing more than "a doctrinal recapitulation masquerading as a legal argument."  Id.

Regarding plaintiff's claimed issues of fact, he attempts to create such issues in several ways.  First, he claims that when Sorel spoke with Dr. Naghibi on May 27th, she "had no idea how long plaintiff had been suffering ["DTs"] and did not therefore convey that information to" the doctor.  Pl. Resp. to Sorel at 3, ¶ 33 (citing Doc. 55, exh. E thereto at 85-87).  Assuming that the cited portion of Ms. Sorel's deposition supports this statement, the same does not create a genuine issue of material fact so as to defeat Sorel's summary judgment motion.  No such factual issue is created because as the undisputed facts set forth above show, within an hour and a half of first noticing that plaintiff was having what she "believe[d] to be" AWS, Sorel contacted the Jail physician, who ordered Librium, which she then administered.  See Sorel Stmt at ¶ 18 (citing Doc. 55, exh. E thereto at 47; Pl. Resp. to Sorel at 2, ¶ 18.  Those actions certainly do not evince "a mental state equivalent to criminal recklessness," which is the standard required to

sustain a deliberate indifference claim.  See Young-Flynn, 2005 WL 3544087, at *3.

Second, plaintiff cannot avoid summary judgment on the theory that Sorel "knew or should have known on May 27, 2002 at approximately 8:00 p.m. that [he] had a history of alcohol use and/or dependency." Pl. Resp. to Sorel at 3, ¶34 (citing Doc. 55, exh. C thereto; and Sorel Dep. at 37-40).  In his Medical History Report, which Sorel filled out, plaintiff did report a "history of alcohol use," but not dependency.  Pl. Resp. to Sorel at 3, ¶ 34 (citing Doc. 55, exh. C thereto; and Doc. 55, exh. E thereto at 37-40).  In fact, the only reported detail of alcohol use was that plaintiff had a "6 pkg" of beer the day before his incarceration.  Id. (citing Doc. 55, exh. C thereto at 1).  Because Sorel filled out that report it is reasonable to infer that she was aware of plaintiff's reported alcohol use.  Regardless, plaintiff has not shown how such awareness creates a genuine issue of material fact as to Sorel's alleged deliberate indifference.  Indeed, Sorel's call to Dr. Naghibi because she believed plaintiff was suffering from AWS is consistent with her knowledge that plaintiff had a history of alcohol use.

Third,  plaintiff claims that defendant[] Sorel . . . w[as] aware, or could and should have become aware," of the following:

> that [p]laintiff: 1) was suffering pain;
>  2) had defecated and/or urinated on himself
> causing a significant and noticeable odor
> on the —1 Unit; 3) could not walk and lay on
> his cot in his cell, and; 4) was moaning in pain.

Id. at 3, ¶ 36.  Insofar as the alleged pain is concerned, plaintiff claims that Sorel should have been aware of same because inmate Rios told her to see plaintiff about it.  Id. at 3-4, ¶ 36 (citation omitted).  Supposedly  defendant Sorel did not

respond to any of the foregoing, which from plaintiff's standpoint creates a genuine issue of material facts as to whether Sorel was deliberately indifferent. See id. at 4, ¶ 38.  Assuming *arguendo* that the record supports the forgoing assertions,[10] plaintiff still has not demonstrated an issue of fact that, if resolved in his favor, would show that the care rendered by defendant Sorel on May 27, 2002, rose to the level of a constitutional deprivation.

All of the foregoing conditions, such as being in pain and unable to walk, are equally consistent with AWS as with a fractured pelvis.  And, as discussed above, defendant Sorel did  promptly respond to what she believed to be plaintiff's diagnosis at the time – AWS.  The fact that she may have misdiagnosed plaintiff in terms of his fractured pelvis and/or rendered faulty judgment in connection therewith is, without more, at most malpractice which is *not* cognizable under section 1983.  See Hannah, 2005 WL 2042074, at *3.

Moreover, there is nothing in the record to show that on May 27, 2002, defendant Sorel knew or should have known that plaintiff had a fractured hip.  As just stated, his symptoms could just as easily have been attributable to AWS as to a fractured pelvis.  This is all the more so considering that there was nothing during plaintiff's "Initial Medical Screening," nor in his "Medical History Report," both of which Sorel filled out upon plaintiff's May 23, 2002 admission to Jail, indicating that he had any problems whatsoever with his hip.

At this "Initial Medical Screening," plaintiff did not show any "visible signs of trauma, illness, pain or bleeding that require[d] emergency care[.]" See Doc. 71, exh. B thereto.  Asked directly whether he "ha[d] any medical condition that [the

---

[10]       Due to the lack of a time frame in the cited portions of Rios' deposition, it is not at all certain whether any of these conditions actually existed on May 27, 2002.

Jail] should know about[,]" plaintiff answered that he was taking "prilosec[.]" Id.
He did not mention AWS and/or a fractured pelvis.  In fact, at that time, plaintiff's
most "recent[]" reported "treat[ment] by a doctor or hospitaliz[ation]" had been
"[f]or stomach problems[;]" not for AWS or for a fractured hip.  See id. Plaintiff
signed this Screening form three times, including a certification that the
information "supplied by" him was "true and complete to the best of [his]
knowledge." Id.  Likewise, on the "Medical  History Report," which defendant
Sorel also filled out upon plaintiff's incarceration, when specifically asked about
"[p]ainful or [s]wollen [j]oints[,]" he answered, "NO."  Doc. 71, exh. C thereto at
1.  Under these circumstances, defendant Sorel would have had no reason to doubt
plaintiff or  question him about his pelvis.

Fourth, plaintiff claims that inmate Rios told defendant Sorel that
"[p]laintiff was in pain and asked" her to see plaintiff, but she "never" did, and
this too creates a factual issue as to whether or not Sorel was deliberately
indifferent.  See  Pl. Resp. to Sorel at 4, ¶ 37 (citations omitted).  Plaintiff provides
two cites to the record, but neither supports this proposition.  See id. (citing, *inter
alia*, Doc. 73, exh. E thereto at 20-22).  Page 49 of the M-1 Unit Log does not
mention any such communication between plaintiff and defendant Sorel, let alone
that Sorel did not respond to same.   Indeed, instead of ignoring plaintiff, that page
shows, as noted earlier, that Sorel was going to contact Dr. Naghibi "for
medication for [inmate] Burgess['] D.T.s[.]" Doc. 55, exh. G thereto at 49.

Even if the cited portions of Rios' deposition establish that he spoke to
Sorel about plaintiff,[11] they do not establish that he told Sorel that plaintiff was in

---

[11]      This assumption is doubtful because Rios testified that Rose was not the first
name of the woman to whom he spoke; rather it was "only [the] name [the inmates] used to call

pain.  The cited portion of Rios' testimony was far more ambiguous on that point.

He testified that he told "the nurse in medication . . . *to go check*" on "an inmate in

room 15[,]" which is where plaintiff was housed.  Id. (citing Doc. 73, exh. E

thereto at 20; and 21) (emphasis added).  The relevance of this testimony is further

undermined by the lack of a time frame.  Failing to check on an plaintiff for some

indeterminate reason, at some unknown point during his nearly two week

incarceration, does not present a fact issue which would preclude summary

judgment on the issue of whether Sorel was deliberately indifferent.

     As the foregoing discussion shows, plaintiff Burgess has not come forth

with any evidence even tending to support an inference that defendant Sorel acted

with a sufficiently culpable state of mind, either in treating or failing to treat his

AWS and/or fractured pelvis, so as to sustain a claim of deliberate indifference

against her.  For example, plaintiff has not directed the court to any record

evidence "describ[ing] a mental state *more blameworthy* than negligence[.]"  See

Herndandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003) (citation omitted)

(emphasis added).  Certainly there is nothing in defendant Sorel's actions or

inaction on May 27, 2002, which "shock[s] the conscience or constitute[s] a

barbarous act."  See Hannah, 2005 WL 204204, at *3 (internal quotation marks

and citations omitted).  In the absence of such proof, "there can be no genuine

issue of material fact[;]"  and hence, "summary judgment [in Sorel's favor] is

appropriate."  See Fox v. Town of East Haven, No. Civ. 302CV1540WWE, 2006

---

her[.]"  Doc. 73, exh. 73 thereto at 22.  As defendant Sorel's attorney was quick to point out
during oral argument, her first name is Rosemary – not Rose.  Tr. at 17.  Adding further
confusion to the issue of the name of the woman to whom Rios purportedly spoke to regarding
plaintiff's pain is the fact that originally Pauline Rose, another LPN, was named as a defendant in
this action.

WL 287208, at *2 (D.Conn. Jan. 6, 2006) (citing <u>Celotex</u>, 477 U.S. at 322-23).

As explained at the outset, as did defendant Sorel, the court has framed its analysis almost exclusively in terms of whether she was deliberately indifferent on May 27, 2002.  However, because plaintiff's complaint and opposition papers can be read as asserting that she was also deliberately indifferent on other days, the court will expand its analysis accordingly.

Prior to May 27, 2002, defendant Sorel had seen plaintiff on May 23, 2002, his first day in jail, when Sorel did an "Initial Medical Screening."  <u>See</u> Doc. 71, exh. B thereto.  Several of plaintiff's responses to that screening are particularly noteworthy.  Plaintiff denied "regular[] use" of alcohol, and he did not "appear to be under the influence of alcohol/drugs[;]" at that time.  <u>Id.</u>  Nor did plaintiff have "signs of [alcohol/drug] withdrawal[.]" <u>Id.</u> Turning to the issue of medication, when asked whether he was "carrying any. . . or taking any . . . prescribed by a doctor[,]" plaintiff answered that he was taking medication for "depression, anxiety[.]" <u>See id.</u>  This response is consistent with Sorel's observation that plaintiff "appear[s] to have . . . psychiatric problems[.]"  <u>Id.</u>

On the "Medical History Report," which Sorel evidently also filled out on May 23, 2002,[12] plaintiff reported a history of alcohol use, with his "last use"

---

[12]     There is a discrepancy as to the date of this document.  Page one gives the date as May 29, 2002, but page two indicates May 23, 2002, and May 23, 2004, in another place. <u>Compare</u> Doc. 71, exh. C thereto at 1, <u>with</u> Doc. 71, exh. C thereto at 2.  The first is May 23, 2002, which is given in two separate places on that page two.  <u>Id.</u>, exh. C thereto at 2.  Obviously that 2004 date is wrong.  As between May 23, 2002, and May 29, 2002, however, reading the Medical History Report as a whole and taking into account other parts of the record, it is reasonable to infer that Ms. Sorel questioned plaintiff and filled out this form on May 23, 2002. That is so because it is undisputed that plaintiff was first incarcerated on May 23, 2002. Therefore, the notation of plaintiff having had beer "yesterday," would make no sense if the date was May 29, 2002, because he was in jail the prior day (May 28, 2002) and presumably would not have had access to beer then.

27

being a "6 pkg" of beer "yesterday," *i.e.* May 22, 2002 -- the day before his incarceration.  See Doc. 71, exh. C thereto at 1.  As on the Initial Medical Screening form, this report indicates that plaintiff was not then "under [the] influence [of] . . . [a]lcohol[.]"  See id.  Moreover, he was "alert/oriented[.]"  Id.  However, also as with his Initial Screening, plaintiff did report that he had depression, but he did not have any "[p]ainful or [s]wollen [j]oints[.]"  See id.

Plaintiff asserts that defendant Sorel saw him five more days after that initial screening.  In particular, leaving aside May 27th, plaintiff claims that Sorel administered prescription medications to him on May 24th, 28th, 29th, and 30th.  See Doc. 71 at 6, ¶ 16.  However, the cited parts of the record only establish that Sorel administered medications to plaintiff on two of those days  – May 24th and 27th.  See id. (citing Doc. 55, exh. I thereto at 1; Doc. 55, exh. G thereto at 49-50).  Because those particular cites do not substantiate plaintiff's claim that defendant Sorel gave him medications on May 28, 29, and 30, 2002, this court will proceed as have other courts within this Circuit when faced with a situation where the cited materials do not support a party's factual assertions, and disregard same.  See Holtz v. Rockefeller & Co., Inc. 258 F.3d 62, 73-74 (2d Cir. 2001) (and cases cited therein).  This lack of proof is significant because without it there is no evidence that Sorel saw plaintiff on those days, and hence nothing to substantiate the theory that on those dates Sorel knew or should have known that plaintiff was in pain, etcetera.

In light of the foregoing, plaintiff has failed to come forth with evidence showing a genuine issue of material fact with respect to whether defendant Sorel was deliberately indifferent on May 27 or May 28-30, 2002.  As such, defendant Sorel is entitled to summary judgment on the due process claims against her.  The

28

court will proceed with its analysis regarding plaintiff's claims of deliberate indifference by nurses Mac Isaac and Cicognani.

### *ii.  Defendant MacIsaac*

Defendant MacIsaac's first contact with plaintiff was sometime between 8:00 a.m. and 9:30 a.m on May 28, 2002, the day after he had been diagnosed with AWS.  Doc. 55 at ¶ 24 (citing exh. F thereto at 61); Pl. Resp. at 3, ¶ 24. Sometime thereafter, but before 12:30 p.m. when she made her notes for the morning, MacIsaac also took plaintiff's vital signs, *i.e.* his blood pressure, pulse and respiration, and found them to be within normal limits.  Id. at 62-65. According to defendant MacIsaac, the "purpose" of noting plaintiff's normal vital signs was to show that he was "responding to his [AWS] protocol[,]" id. at 65, a fact which plaintiff readily concedes.  Pl. Response to MacIsaac at 3, ¶ 26.

MacIsaac saw plaintiff again on May 31, 2002 at approximately 10:00 a.m. when she noted that he was complaining of pain to his left hip.   Id. (citing Huttner Aff., exh. J thereto).  She noted that plaintiff was "unable to bear weight." Id.  At that time plaintiff  "report[ed] he 'fell a few days prior to coming to the hospital[].'"  Id.  According to those May 31, 2002, progress notes, plaintiff "consented" to defendant MacIsaac "speaking" to a doctor."  Id.  Defendant MacIsaac noted, however that she "could not find" one.  Id.  Nonetheless, she explicitly stated that plaintiff was "to have x-ray of [left] hip/pelvis."  Id.  Plaintiff was then sent for an x-ray at 3:18 p.m. on May 31st.  See Huttner Aff., exh. G thereto at 75.

In his opposing memorandum,  plaintiff's initial response is to make a bald, wholly uncorroborated assertion which apparently is intended to show that MacIsaac was deliberately indifferent.  In particular, plaintiff contends:

"Defendant . . . MacIsaac observed [him] after he was suffering from a fractured hip, was face to face with him and again considering the jail log notations and complaints and reports of other inmates and the fact that he had to be transported in a wheelchair, completely failed to respond and provide Plaintiff any care or treatment or see that he received any care or treatment."  Doc. 74 at 3.  Clearly this statement, which does *not* include supporting cites to the record, is at odds with the facts outlined above, which are supported by the record.  Accordingly this bald conclusory assertion is completely inadequate to withstand defendant MacIsaac's summary judgment motion on the issue of deliberate indifference.

Further, plaintiff's counter L.R. 7.1(a)(3) Statement is insufficient to create a genuine issue of material fact with respect to the alleged deliberate indifference by defendant MacIsaac.  As previously discussed, the allegations in paragraph 36 of that Statement do not suffice to meet plaintiff's burden as the non-moving party on this summary judgment motion.  As also explained above, to the extent plaintiff is relying upon the *entire* Rios deposition, the court will not take same into account given plaintiff's failure to parse out the relevant portions.

Based in part upon the May 31, 2002 note by defendant MacIsaac previously referenced in his counter L.R. 7.1(a)(3) Statement, plaintiff contends that even though MacIsaac noted that he had pain in his left hip at 10:00 a.m., she did not seek an x-ray from the jail doctor, and he did not leave the unit for an x-ray until 3:18 p.m., slightly more than five hours later.  Even if the citations which plaintiff proffers supported that version of events, which they do not, at most defendant MacIsaac's inaction in this regard would amount to negligence which, as previously noted, is not actionable under section 1983.  Furthermore, again, even assuming *arguendo* that MacIsaac did not get an x-ray for the doctor and

30

plaintiff did not leave the unit for an x-ray for five hours, that delay, without more, does not "give rise to a reasonable inference that [defendant MacIsaac] knew of [a] serious medical need[] and intentionally disregarded it." See Perez v. Hawk, 302 F.Supp.2d 9, 20 (E.D.N.Y. 2004).  There is no evidence whatsoever that MacIsaac intentionally delayed plaintiff's x-ray, much less that she did so as a form of punishment, or that the delay was due to anything more than administrative reasons.  Cf. Archer, 733 F.3d at 16.  For the aforementioned reasons, defendant Mac Isaac is entitled to summary judgment as to the due process claims against her.

### iii.  Defendant Cicognami

Defendant Cicognami contends that her interaction with plaintiff was limited to Sunday morning, May 26, 2002,[13] when she checked the results of his tuberculosis test by looking at the test site on his arm.  Grogan Aff., exh. B at 53. After observing that plaintiff tested negative for tuberculosis, defendant Cicognami "medically cleared [him] to leave the isolation unit."  Doc. 58 at 1; see also Grogan Aff., exh. B at 53.  Plaintiff does not contend otherwise.  Indeed, he testified that he "didn't" remember "meet[ing] with a nurse on Sunday morning," May 26, 2002.  Doc. 55, attach. 2, exh. C at 70.  He also acknowledged that he did not recall complaining of left hip pain to anyone in the Jail that morning.  Id.

In her memorandum of law, defendant Cicognami contends that during her morning shift at the Jail no one "advised [her] of any facts that would lead her to

---

[13]     Both in her memorandum of law and her "Supplemental Statement of Material Facts" defendant Cicognami misstates the date as "May 26, *2005*."  Doc. 58 at 1 (emphasis added); and Doc. 58, attachment 5 at ¶ 2 (emphasis added).  At oral argument, counsel for Cicognami clarified that this is a typographical error, and that the correct date is May 26, 2002. See Tr. 49:21-50:4.

have any concern for plaintiff's welfare or health." Doc. 58 at 2.  She further claims that while checking plaintiff for tuberculosis, she "observed no irrational or erratic behaviors by [him]." Id.  Nowhere in her memorandum of law or Supplemental Statement of Facts did defendant Cicognami cite to the voluminous record to support these conclusory statements.

Defendant Cicognami expressly adopted the L.R. 7.1 Statement of defendants MacIsaac and Sorel,[14] which she supplemented with her own such Statement.  In her Supplemental Statement defendant Cicognami adds two facts which plaintiff admits.  The first is that Cicognami is a LPN who began working with Adept at the Jail in October 1996.  Doc. 58, attach. 5 at ¶ 1.  The second admitted fact is that she worked the 8:00 a.m. - 4:00 p.m. shift at the Jail on May 26, 2002.  Id. at ¶ 2.

In his Memorandum of Law opposing Cicognami's motion for summary judgment, Plaintiff argues, without citation to the record, that "by and before May 26, 2002," "Plaintiff was in a desperate and dire physical condition," and that for Nurse Cicognami "[t]o acknowledge observation of and contact with the Plaintiff at that time and not acknowledge his condition and to submit she had no reason to suspect any further interaction with the Plaintiff was necessary or advisable is simply not credible."  Doc. 73 at 1.  At oral argument, counsel for plaintiff elaborates on this argument to the extent he cites the May 26, 2002 entries of the medical unit log, which he alleges reflect plaintiff was "ranting and sweating" at the time Cicognami interacted with him.  See Tr. at 27:21-29:23.  The court's review of the medical unit log entries for May 26, 2002 reveals that at 9:48 a.m., it was noted that plaintiff was "ranting, sweating".  See Doc. 55, Huttner Aff. Exh. G

---

[14]      Grogan Aff. at ¶ 11.

at 38.  Thirty five minutes later, it was noted that plaintiff was "medically cleared".  See id.

Upon its own further review of the record, the court notes Cicognami testified that she did not have any recollection specific to May 26, 2002 regarding whether she reviewed the medical unit log when she came on duty.  See Doc. 58 at Exh. B, 37:19-22.  Further, Cicognami testified that did not recall plaintiff "ranting and sweating" that day, only that she checked his arm to read the tuberculosis test.  Id. at 49:18-20; 53:3-8.  There is no evidence to indicate Cicognami was present and observed plaintiff while he was in a state of upset, thus no evidence that she consciously disregarded same.  As such, Cicognami is entitled to summary judgment on plaintiff's due process claim against her.

### iv.  Municipal Defendants

As mentioned at the outset, plaintiff's first section 1983 cause of action is against *all* of the individual defendants.  In moving for summary judgment on their behalf, except for the defendant doctor, attorney O'Connor did not distinguish between these defendants (Sheriff Keating, Undersheriff Walraed, Sheriff Department Colonel Loveridge and Sheriff Department Lieutenant Smith). Rather, it is the municipal defendants' position that they were not deliberately indifferent because the "deposition testimony of the Correction Officers and the nursing staff conclusively establish procedures at the jail during plaintiff's confinement reasonably calculated to address plaintiff's [AWS]."  Doc. 63 at 9. These defendants provided no legal analysis whatsoever as to how these claimed "procedures" demonstrate that they are entitled to summary judgment on the issue of deliberate indifference.   They do raise a valid argument in their reply memorandum, however; and that is the seeming lack of evidence that any of the

individual municipal defendants had the requisite culpable state of mind.

In any event, in his opposing memorandum, plaintiff baldly asserts that he has "established the defendants' deliberate indifference to plaintiff's serious medical condition."  Doc. 72 at 2.  Nowhere in that memorandum does he explain how any of the municipal defendants were deliberately indifferent, however. Instead, he recites a host of cases, but he does not apply the law to the facts of the present case.  Thus, as the Second Circuit has so aptly put "[p]laintiff's brief is . . . little more than a doctrinal recapitulation masquerading as a legal argument, tantamount to an invitation [for the court] to scour the record, research any legal theory that comes to mind, and serve generally as an advocate for [plaintiff]." Amnesty America v. Town of West Hartford, 361 F.3d 113, 132 (2d Cir. 2004). Therefore, plaintiff's memorandum does nothing to advance the argument that there are genuine issues of material fact precluding summary judgment on the issue of deliberate indifference.

As previously stated, at oral argument, plaintiff concedes that all municipal defendants are sued in their individual capacities only.  Also at oral argument, plaintiff concedes that the only municipal defendants who had any personal involvement in the underlying events of this action are Hogan and Naghibi, and to a lesser extent, Loveridge, and that all municipal defendants, with the exception of Hogan and Naghibi, are liable as supervisory officials.  See Tr. 32:15-35:3.

"[A] plaintiff asserting a § 1983 claim against a supervisory official in his individual capacity must show that the supervisor was personally involved in the alleged constitutional deprivation."  Baez v. Poole, No. 04-CV-6316L, 2006 WL 3256858, at *3 (W.D.N.Y. Nov. 9, 2006), citing Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001).  Said personal involvement

34

> may be shown by evidence that: (1) the defendant
> participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of the
> violation through a report or appeal, failed to remedy the
> wrong, (3) the defendant created a policy or custom
> under which unconstitutional practices occurred, or
> allowed the continuance of such a policy or custom, (4)
> the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the
> defendant exhibited deliberate indifference to the rights
> of inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

Id., quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995).

Regarding defendants Keating, Walraed and Smith, there is no evidence in the record which would indicate that they had any knowledge of the events at issue in this lawsuit at the time they occurred.  As such, there is no basis for a finding of deliberate indifference on their behalf.

Regarding Loveridge, plaintiff states, again without pinpoint[15] citation to the record, that at some point during plaintiff's incarceration, he conducted a tour of the M-1 Unit.  The court's review of the Unit log reveals that Loveridge was on the M-1 Unit for an inspection at 4:05 p.m. on May 29, 2002.  See Doc. 55, Huttner Aff. exh. G at 61.  Nothing in the log reveals that plaintiff was acting in an unremarkable manner during Loveridge's inspection.  There being no evidence that Loveridge was personally involved in the events underlying this lawsuit, or that he was contemporaneously notified of same, no basis for exists for a finding that he was deliberately indifferent.

---

[15] Counsel for plaintiff, in response to the court's inquiry as to whether this assertion was included in his LR 7.1 statement, contends that the evidence is located in "the Unit 1 log."  See Tr. 33:2-14.  For the record, the court notes that this log contains 76 pages of handwritten notes.

Defendant Hogan's involvement was limited to a meeting with plaintiff on May 24, 2002, well before plaintiff was exhibiting symptoms of AWS.  See Doc. 55, Huttner Aff. exh. G at 22.  As such, no evidence exists upon which Hogan may be found deliberately indifferent.

Finally, defendant Naghibi was not made aware of plaintiff's symptoms until Sorel notified him of same on May 27th.  The evidence is uncontroverted that Naghibi ordered Librium, the standard treatment for AWS, and thereafter same was administered to plaintiff by Sorel.  Plaintiff fails to identify any other evidence of Naghibi's involvement, much less any evidence which would support a finding of deliberate indifference on Naghibi's behalf.

As the aforementioned discussion shows, none of the municipal defendants may be found to have acted with deliberate indifference and as such, are entitled to summary judgment as to plaintiff's due process claims against them.

Moreover, because none of the non-municipal defendants are deliberately indifferent, necessarily the "failure to intercede" and policy or practice claims against the municipal defendants must fail, as plaintiff conceded during oral argument.  See Tr. 48:4-22; 49:7-20.

### C.  Supplemental State Law Claims

Because the court has dismissed all of plaintiff's federal civil rights claims, it declines to exercise supplemental jurisdiction over the remaining state law claims.  See 28 U.S.C. § 1367(c)(3).  Therefore, all of plaintiff's state law claims are hereby dismissed *without* prejudice.[16]

### V.  Conclusion

For the aforementioned reasons, defendants' motions for summary judgment

---

[16]   Plaintiff is reminded that the limitations period for his state law claims was tolled while said claims were pending before this court, and for 30 days after dismissal.  See § 1367(d).

36

are hereby GRANTED, and all federal claims are dismissed with prejudice. Plaintiff's state law claims are dismissed without prejudice.

IT IS SO ORDERED.

DATED:      December 14, 2006
            Syracuse, New York


_____
Neal P. McCurn
Senior  U.S. District Judge